## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| In the Matter of: | § |
| | § Case No. 20-10182-tmd |
| WC 2101 W Ben White, LP | § |
| | § Chapter 11 |
| Debtor. | § |
| | § |
| | § |
| | § |

## MOTION FOR RELIEF FROM AUTOMATIC STAY

**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**

**IF NO TIMELY RESPONSE IS FILED WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.**

**A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

TO THE HONORABLE COURT:

Now comes BBVA USA ("**BBVA**"), formerly known as Compass Bank, and files this Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362 and Rule 4001 of the Federal Rules of Bankruptcy Procedure, and moves for an order allowing it to enforce its rights and remedies against certain property pledged by Debtor to secure indebtedness to BBVA, and in support would respectfully show:

## I.    PRELIMINARY STATEMENT

1.     Debtor is a single-asset real estate debtor.  Debtor's $4.93 million loan with BBVA matured pre-petition, was not paid in full upon maturity, and remains in default.  Prior to the bankruptcy, BBVA posted the Debtor's only asset for foreclosure.  Debtor made false representations, orally and in writing, to induce BBVA it to pull the sale.  Debtor then negotiated

a forbearance agreement with BBVA that contained, among other things, Debtor's agreement to waive protection of the automatic stay with respect to the property in any future bankruptcy.

2.      Almost immediately, Debtor breached the forbearance agreement, and BBVA posted the property once again for foreclosure.  Debtor notified BBVA of this bankruptcy case **<u>four minutes</u>** before the foreclosure sale was to begin.

3.      Debtor did not file its schedules until more than three weeks into the case.  Despite the U.S. Trustee's request at the Section 341 Creditor's Meeting that Debtor amend its schedules to cure various deficiencies and to file monthly operating reports, it has not done so.

4.      Debtor has not filed a plan.

5.      Debtor has made no known efforts to market the property or obtain refinancing.

6.      Debtor has not paid property taxes for 2018 or 2019, which now total in excess of $500,000.

7.      As discussed in more detail below, notwithstanding Debtor's equity in the subject property, relief from the automatic stay is warranted because: (a) Debtor waived its right to protection of the automatic stay in the pre-petition forbearance agreement; or, in the alternative, (b) Debtor's bankruptcy case constitutes a bad-faith bankruptcy filing under the Fifth Circuit's *Little Creek* standard justifying relief from the stay.

## II.      <u>JURISDICTION & VENUE</u>

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).  This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(a), 157(b)(2)(G).  BBVA consents to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1409.

### III.    EXHIBITS

10.     Attached hereto in support of this motion and the relief requested herein, are the following declarations and exhibits:

- **Exhibit A**:  April 29, 2020 Declaration of Kenneth J. Daigrepont, Vice President in the ARMS Division of BBVA USA, with the following exhibits attached:

  o  Exhibit A-1: December 27, 2013 Closed-End Multi-Advancing Promissory Note;

  o  Exhibit A-2: December 26, 2013 Deed of Trust;

  o  Exhibit A-3: December 26, 2013 Guaranty Agreement;

  o  Exhibit A-4: February 25, 2019 Promissory Note Modification Agreement;

  o  Exhibit A-5: February 22, 2019 Modification of Deed of Trust;

  o  Exhibit A-6: Payment and transaction history;

  o  Exhibit A-7: June 24, 2019 letter from BBVA to Debtor;

  o  Exhibit A-8: July 3, 2019 letter from BBVA to Debtor;

  o  Exhibit A-9: Payoff statement as of April 28, 2020; and

  o  Exhibit A-10:  January 22, 2020 Appraisal.

- **Exhibit B**:  April 30, 2020 Declaration of Sarah Santos, counsel-of-record for BBVA, with the following exhibits attached:

  o  Exhibit B-1:  September 13, 2019 letter from counsel to Debtor;

  o  Exhibit B-2:  November 1, 2019 letter from counsel to Debtor;

  o  Exhibit B-3:  November 15, 2019 e-mail correspondence;

  o  Exhibit B-4:  November 19, 2019 e-mail correspondence;

3

o  <u>Exhibit B-5</u>:  November 21, 2019 e-mail correspondence;

o  <u>Exhibit B-6</u>:  November 23, 2019 e-mail correspondence;

o  <u>Exhibit B-7</u>:  December 2, 2019 e-mail correspondence;

o  <u>Exhibit B-8</u>:  December 2, 2019 Post-Maturity Payment Agreement;

o  <u>Exhibit B-9</u>:  December 3, 2019 e-mail correspondence;

o  <u>Exhibit B-10</u>:  December 6, 2019 e-mail correspondence;

o  <u>Exhibit B-11</u>:  December 13, 2019 letter from counsel to Debtor;

o  <u>Exhibit B-12</u>:  January 7, 2020 e-mail correspondence;

o  <u>Exhibit B-13</u>:  January 7, 2020 e-mail correspondence;

o  <u>Exhibit B-14</u>:  January 13, 2020 letter from counsel to Debtor;

o  <u>Exhibit B-15</u>:  February 3, 2020 e-mail correspondence;

o  <u>Exhibit B-16</u>:  February 4, 2020 e-mail correspondence

o  <u>Exhibit B-17</u>:  Excerpts from January 13, 2020 hearing in *In re 900 Cesar Chavez, LLC*, Bankr. No. 19-11527; and

o  <u>Exhibit B-18</u>:  March 23, 2020 e-mail correspondence.

## IV.  <u>BACKGROUND</u>

**A.  Debtor's pre-petition default on its matured loan with BBVA.**

11.  On or about December 27, 2013, Debtor obtained a loan from BBVA in the amount of $4,930,000.00 (the "**Loan**"), as evidenced by the Closed-End Multi-Advancing Promissory Note, dated December 27, 2013 in the original principal balance of $4,930,000.00, executed by Debtor, payable to the order of BBVA (the "**Note**").  *See* **Exhibit A-1**.

12.  In connection with the Note, Debtor granted BBVA a first lien on certain real and personal property (collectively, the "**Property**") in order to secure the indebtedness owed to

BBVA, as evidence by a Deed of Trust, dated December 26, 2013, executed by Debtor in favor of BBVA (the "**Deed of Trust**").  *See* **Exhibit A-2**.

13.     In connection with and to secure the payment of the Note, Natin Paul, who is the Manager of WC Ben White, LLC, a Texas limited liability company that serves as the limited partner of Debtor, executed a Guaranty Agreement, dated December 26, 2013 ("**Guaranty**"), unconditionally and absolutely guaranteeing the payment of the Note and all indebtedness and liabilities owed to BBVA.  *See* **Exhibit A-3**.

14.     Pursuant to the terms of the Note and Deed of Trust, the Loan matured and was fully payable within five years - on December 27, 2018.  *See* Ex. A-1 p. 6; Ex. A-2. p. 1.  Debtor and BBVA subsequently modified the Note and Deed to Trust to provide for an extension of the maturity date to March 27, 2019.  True and correct copies of the "**Amended Note**" and "**Amended Deed of Trust**" are attached hereto as **Exhibit A-4** and **Exhibit A-5**, respectively.   Together, the Note, Deed of Trust, Amended Note, and Amended Deed of Trust are collectively referred to herein as the "**Loan Documents**."

15.     Debtor failed to pay the Loan upon its maturity on March 27, 2019.  *See* **Exhibit A-6**; *see also* Ex. A ¶6.

**B.  Debtor's fraudulent inducement of BBVA to pass on foreclosure and enter a forbearance agreement.**

16.     On or about June 24, 2019, July 3, 2019, and September 13, 2019, BBVA notified Debtor and Guarantor that failure to pay the matured loan constituted a default and it demanded payment for the total amount due on the Note.  *See* **Exhibit A-7**, **Exhibit A-8**, and **Exhibit B-1**. Debtor and Guarantor failed to pay.  *See* Ex. A ¶6; Ex. A-6.

17.     Accordingly, pursuant to the terms of the Loan Documents, BBVA posted the Property for a December 3, 2019 foreclosure (the "**First Foreclosure**") and provided notice of the same to Debtor on November 1, 2019.  *See* **Exhibit B-2**.

18.     Shortly after receiving notice of the foreclosure posting, Debtor initiated discussions with counsel for BBVA requesting a repayment agreement in lieu of the First Foreclosure.  *See, e.g.* **Exhibit B-3**.  As discussions continued, proposed terms for a forbearance agreement were exchanged between counsel.  *See* **Exhibit B-4**.  From the very first draft exchanged, the terms of the forbearance agreement always included a waiver of automatic stay protection should Debtor file bankruptcy.  *See* Exs. B-3, B-4.

19.     An agreement was ostensibly reached on November 20, 2019, but counsel for Debtor requested an effective date of November 18, 2019.  *See* **Exhibit B-5**.  BBVA accepted this request so long as Debtor: (a) provided the executed agreement that day; and (b) wired the $510,622.76 in funds required to be paid on the effective date that day.  *Id.*  Debtor did not provide the signed agreement and did not make the required payment.  The next day, counsel for Debtor represented in an e-mail that "my client [Debtor] intends to sign [the agreement]. It is currently circulated for signature."  *See id.*

20.     On November 25, 2019, Debtor had still not made the payment.  Counsel for BBVA provided wire instructions once again.  *See* **Exhibit B-6**.  Another day passed, and the payment was still not made.  *Id.*

21.     Finally, on November 27, 2019, less than one week from the First Foreclosure, Debtor provided the signature page to the agreement but stated that payment could not be made until December 2, 2019—the day before the scheduled foreclosure on December 3, 2019.  *See* **Exhibit B-7**.  Accordingly, a revised agreement was drafted and executed by both Debtor and

BBVA with an effective date of December 2, 2019, and requiring the following payments on the Effective Date (and before the First Foreclosure sale): (a) $538,829.53 (representing accrued interest); and (b) $201,476.90 (representing a paydown on the principal). *See* **Exhibit B-8** (the "**Forbearance Agreement**"). The Forbearance Agreement required an additional payment of $201,476.90 by December 31, 2019, with a final payoff due on or before January 31, 2019. *Id.*

22.     Debtor immediately breached the Forbearance Agreement by failing to make the $538,829.53 and $201,476.90 payments on December 2, 2019, as required. *See id*. On December 3, 2019, the day of First Foreclosure sale, Debtor wired the $201,476.90 payment (that was due the day prior). *See* **Exhibit B-9**.

23.     Later that afternoon, counsel for Debtor forwarded counsel for BBVA an e-mail from Natin Paul, that said:

**From: Nate Paul** <npaul@world-class.com>
**Sent:** Tuesday, December 03, 2019 3:46 PM
**To:** Brian Elliott <belliott@world-class.com>
**Subject:** Ben White

Brian,

I have authorized the wire of the accrued interest of $538,829.53 that is queued to be released to BBVA at the below instructions tomorrow. Thanks.

BBVA USA
ABA/Routing No.: 113010547
Account No.: 90173036
Attn: DO NOT POST Contact: LDFCARMSDallas.us@bbva.com
Ref: WC 2101 W Ben White, LP

*See* **Exhibit B-10**. However, on December 4, 2019, the wire was never processed and Debtor did not make the required payment (now two-days past the due date of December 2, 2019). *See id*.

24.     Counsel for BBVA inquired as to the status of the wire on December 4, 2019, and by December 6, 2019, had still received no response. *Id*. Counsel for BBVA informed Debtor's counsel that Debtor was in default of the Forbearance Agreement:

| | |
|---|---|
| **From:** | Sarah Santos |
| **Sent:** | Friday, December 6, 2019 9:16 AM |
| **To:** | Brian Elliott |
| **Subject:** | RE: Ben White |

Brian,
I have yet to receive a response from you and have confirmed that the interest payment has not been made as agreed and represented by Mr. Paul in his e-mail, which we relied on to pull the December foreclosure. Your client is in default of the Payment Agreement we executed.

*See id*.

### C. BBVA's second and third attempts to foreclose on the Property.

25.     Accordingly, as provided for in the Forbearance Agreement and Loan Documents, on December 13, 2019, BBVA provided notice to Debtor that the Property would be sold at a foreclosure sale scheduled for January 7, 2020 (the "**Second Foreclosure**"). *See* **Exhibit B-11**.

26.     On January 6, 2020, the day before the Second Foreclosure sale, Debtor's counsel requested that the Second Foreclosure be pulled in exchange for a $380,000 payment. *See* **Exhibit B-12**.   BBVA agreed to pull the Second Foreclosure if Debtor made the $380,000 payment by 10:00 a.m.  *Id*.  The deadline of 10:00 a.m. came and went, and no wire was received.  *See id*.  The $380,000 payment was not received until after 4:00 p.m. that date.  *See* **Exhibit B-13**.

27.     During these discussions, BBVA made clear that it was only agreeing to pull the Second Foreclosure, was not agreeing to anything else, and reserved all of its rights for breach of the Forbearance Agreement.  *Id*.  In fact, BBVA notified Debtor that the Property would be posted for another foreclosure sale to occur on February 4, 2020 (the "**Third Foreclosure**").  *Id*.; *see also* **Exhibit B-14**.

28.     Debtor failed to pay off the matured Loan on January 31, 2020 as required by the Forbearance Agreement.  *See* Ex. A-6.  On January 30, 2020, counsel for BBVA requested that counsel for Debtor confirm that the Loan would be paid off as agreed by the following date.  *See*

**Exhibit B-15**.  Debtor confirmed it would not be able to make the payments.  *Id*.  Accordingly, counsel for BBVA advised that the Third Foreclosure sale would be proceeding.  *Id*.

29.     On February 3, 2020, the day before the Third Foreclosure, Debtor, through its counsel, predictably reached out yet again asking for additional time and another forbearance of the Third Foreclosure.  *Id*.  This time, Debtor represented that it intended to refinance the Loan "imminently."  *Id*.  BBVA requested a commitment letter from the bank or lender associated with the refinance, but Debtor refused to provide any such assurances without a Non-Disclosure Agreement.  *Id*.

30.     BBVA prepared for the Third Foreclosure sale scheduled to begin at 10:00 a.m. on February 4, 2020 and its counsel traveled to Austin for the same.  At 9:56 a.m., just four minutes before the sale, Debtor informed BBVA that it had filed this bankruptcy petition as a single-asset case under Chapter 11.  *See* **Exhibit B-16**.  Thus, once again—this time just moments before the Third Foreclosure sale—Debtor avoided foreclosure.

31.     As of April 28, 2020, the total amount of principal, interest (at the post-maturity rate), fees, expenses, late charges, and penalties (not including attorneys' fees) owed under the Note is **$4,319,837.22** (comprised of $4,012,910.53 in principal, $272,686.35 in unpaid interest, $7,805.05 in  expenses, and $26,435.29 in legal fees (through March 31, 2020)).  *See* Ex. A ¶11; Ex. A-9.  The amounts owed will continue to accrue post-maturity interest and other fees and charges until paid, in accordance with the terms of the Notes and Loan Documents.

## V.     ARGUMENTS & AUTHORITIES

32.     BBVA's motion for relief from the stay should be granted on either of two, independent and alternative grounds: (a) because Debtor contractually waived his right to automatic stay protection of the Property in the pre-petition Forbearance Agreement; or (b)

because there is "cause" to lift the stay under Section 362(d)(1) and the "totality of the circumstances" test set forth in *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). While BBVA can satisfy both of these grounds, only one is required to grant this motion.

### A. Debtor's pre-petition stay waiver is enforceable and warrants relief from the automatic stay for BBVA.

33.     While pre-petition agreements that waive all protections of the Bankruptcy Code are considered against public policy, "the majority view, and the trend in bankruptcy decisions, is that pre-bankruptcy waivers of the automatic stay are sometimes enforceable." *Wells Fargo Bank Minnesota, N.A. v. Kobernick*, No. C.A. 8-CV-1458, 2009 WL 7808949, at *7 (S.D. Tex. May 28, 2009), *aff'd sub nom. U.S. Bank, Nat. Ass'n v. Kobernick*, 454 Fed. Appx. 307 (5th Cir. 2011). Courts typically will not enforce pre-petition waivers of stay of relief that are part of original loan documents, but they may be enforced when they arise from forbearance agreements (as is the case here) or from previous Chapter Eleven filings. *Id*.

34.     The bankruptcy court for the District of South Carolina summarized the policy reasons for enforcement of such waivers:

> Perhaps the most compelling reason for enforcement of the forbearance agreement is to further the public policy in favor of encouraging out of court restructuring and settlements. Bankruptcy courts may be an appropriate forum for resolving many of society's problems, but some disputes are best decided through other means.  In the instant case the Debtor received relief under the forbearance agreement approximating that which would have been available in a bankruptcy proceeding. The pending foreclosure sale was canceled, the foreclosure action was dismissed, and the Debtor gained an opportunity to start a new payment schedule which would prevent further action as long as she made the payments she agreed to make.  To allow her now to receive the full benefits resulting from reimposition of the automatic stay as to [the secured lender] would be inconsistent with this Court's oft-stated skepticism regarding serial bankruptcy filings.

*In re Cheeks*, 167 B.R. 817, 819 (Bankr. D.S.C. 1994); *see also In re Darrell Creek Assocs., L.P.*, 187 B.R. 908, 913 (Bankr. D.S.C. 1995) (granting motion to lift stay where debtor's pre-petition

10

workout agreement contained a stay waiver noting that "that such out-of-court workouts are to be encouraged and are often effective"); *In re Bryan Road, LLC*, 382 B.R. 844, 848 (Bankr. S.D. Fla. 2008) (enforcing pre-petition stay waiver in forbearance agreement and granting secured lender relief from stay),

35.     Here, facing an imminent foreclosure, Debtor negotiated a new payment schedule in the Forbearance Agreement that would prevent BBVA's sale of the Property so long as Debtor complied.  In exchange for this forbearance, BBVA accepted Debtor's promise and covenant to waive protection of the automatic stay in any future bankruptcy.  Debtor was represented by counsel, Brian Elliott, during these negotiations.  Mr. Elliott is not only an attorney and in-house counsel for World Class Capital Group, he also has his real estate license.  *See* **Exhibit B-18** at 132:15-19; 136:10-12.

36.     Debtor's principal, Nate Paul, is a sophisticated businessman who has been in the real estate market for over thirteen years.  *Id*. at 47:10-13.  Mr. Paul, through his entities, owns about 100 different commercial properties in seventeen states across the country.  *Id*. at 58:16-20. Debtor's Principal, Mr. Paul, was intimately familiar with bankruptcies and the concept of the automatic stay.  In fact, at the time the Forbearance Agreement was signed (December 2, 2019), five of Mr. Paul's other entities had already filed bankruptcy (all single-asset real estate cases), and four of those entities were already facing motions to lift stay by the secured creditor.  *See In re 900 Cesar Chavez*, Bankr. Case No. 19-11527, ECF Nos. 1, 27.

37.     There is simply no credible argument that Debtor, a sophisticated real-estate developer with its own in-house counsel and was actively involved in stay litigation in other pending bankruptcy proceedings, did not knowingly and voluntarily waive automatic stay protection with its Forbearance Agreement with BBVA.  *See In re Bryan Rd., LLC,* 382 B.R. 844,

849 (Bankr. S.D. Fla. 2008) (considering "the sophistication of the party making the waiver" and the "consideration for the waiver" in granting motion to lift stay based on waiver language in pre-petition forbearance agreement); *In re Frye*, 320 B.R. 786, 791 (Bankr. D. Vt. 2005) (same).

38.     Other factors support enforcing the pre-petition stay waiver, including: (a) Debtor's false representations to induce BBVA into the Forbearance Agreement; (b) the proximity between the waiver (Dec. 2019) and the bankruptcy filing (Feb. 2020) and the lack of changed circumstances in the interim; (c) the prejudice to BBVA in not being able to exercise its contractual remedies under state law (three times over); (d) the public policy of encouraging such workout agreements; and (e) the total lack of evidence for a successful reorganization. *See In re Frye,* 323 B.R. 396, 403 (Bankr. D. Vt. 2005) (considering these and other factors to grant secured lender's motion to lift stay based on waiver).[1]  In circumstances similar to those here, at least one court has not only enforced the pre-petition waiver but also imposed sanctions on the attorney for filing the bankruptcy "just two hours prior to the scheduled foreclosure sale of the debtor's principal asset." *In re McBride Estates, Ltd.*, 154 B.R. 339, 340 (Bankr. N.D. Fla. 1993) (awarding lender attorney's fees and costs where pre-petition settlement agreement, which was incorporated into the confirmed plan of reorganization in Debtor's prior Chapter 11).[2]

39.     For all of these reasons, the Court should enforce the pre-petition waiver in the Forbearance Agreement and grant BBVA's motion to lift stay.

---

[1]     As held in *Frye*, the fact that Debtor has equity in the Property does not preclude enforcement of the pre-petition waiver.  323 B.R. at 400-01 (enforcing pre-petition stay waiver even where lender could not show that the debtor had no equity in the property).

[2]     BBVA is aware of that at least one bankruptcy court in the Fifth Circuit has declined to enforce a pre-petition stay waiver, but that case is distinguishable.  The Bankruptcy Court for the Southern District of Texas declined to enforce a pre-petition waiver where "the waiver was contained in the Note itself, not a forbearance agreement or bankruptcy plan negotiated after Defendants' alleged default."  *Kobernick*, 2009 WL 7808949, at *7.  The court distinguished the precise circumstances here—a waiver in the forbearance context—from its holding.

### B. Alternatively, this Court should lift the automatic stay for "cause" under Section 362(d)(1).

#### i.     *Legal standard*.

40.     Section 362(d)(1) of the Bankruptcy Code states, in part, that a bankruptcy court may grant stay relief under the following circumstances:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest[....]

41.     Under section 362(d)(1), a bankruptcy court may lift the automatic stay for "cause." *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998).  What constitutes "cause" for lifting the stay under Section 362(d)(1) is not defined under the Bankruptcy Code and should be determined on a case-by-case basis based on "an examination of the totality of circumstances."  *In re Brentwood Group No. 1 Ltd.*, No. 10-80093-G3-11, 2010 WL 2900327, at *11 (Bankr. S.D. Tex. July 21, 2010).  Bankruptcy courts have considerable flexibility when deciding whether to lift the automatic stay under Section 362(d)(1).  *In re Mirant Corp.*, 440 F.3d 238, 253 (5th Cir. 2006).

42.     In a single asset real estate bankruptcy case, a court determines whether to lift the stay for "cause" under Section 362(d)(1) independent of any conclusion it may reach regarding the criteria for lifting the stay under Section 362(d)(3). *Brentwood Group*, 2010 WL 2900327, at *11; *see also In re Cameron-811 Rusk, LP,* No. 2010 WL 2735707, at *2 (Bankr. S.D. Tex. July 12, 2010) (noting that relief under 362(d)(3) is "independent from" relief under 362(d)(1)); *In re Pac. Rim Invs. LLP*, 243 B.R. 768, 772 (D. Colo. 2000) ("Moreover, Pacific Rim's argument that § 362(d)(3) is the exclusive provision by which relief from stay can be obtained in a single asset real estate [case] is without merit.").

43.     A lack of good faith in the filing of the bankruptcy case itself constitutes "cause" to lift the automatic stay. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."); *In re Scotia Pac. Co., LLC*, 508 F.3d 214, 223-24 (5th Cir. 2007); *In re WGMJR, Inc.*, 435 B.R. 423, 433 (Bankr. S.D. Tex. 2010) ("The absence of good faith constitutes cause for lifting of the automatic stay.").

44.     Although no precise test exists for determining bad faith in the filing of a Chapter 11 case, the Fifth Circuit in *In re Little Creek* identified the following factors that typically characterize a bad-faith bankruptcy filing:

> The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e) or 364(d)(1). Typically, there are only a few, if any unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors exemplifies, although it does not uniquely categorize, bad faith cases.

*Little Creek*, 779 F.2d at 1073. A bad-faith bankruptcy case does not have to exhibit all these *Little Creek* factors to merit relief. *Id*. at 1072. The bankruptcy court should examine the totality of the circumstances when deciding whether to grant stay relief for cause based on bad faith. *In re City of Angel, LLC*, No. 12-80461-G3-11, 2012 WL 6694075, at *3 (Bankr. S.D. Tex. Dec. 21, 2012).

45.     This Court should grant BBVA stay relief for "cause" under Section 362(d)(1) based on the *Little Creek* factors, as follows:

> ii.     *First <u>Little Creek</u> Factor: single-asset real-estate Debtor and BBVA as secured creditor.*

46.     Debtor is a single asset real estate debtor. Its primary asset is the Property encumbered by the Deed of Trust in favor of BBVA. Debtor has acknowledged BBVA and its lien in its Schedule D. *See* ECF No. 21.

> iii.     *Second <u>Little Creek</u> Factor: insufficient income to sustain a Chapter 11 plan.*

47.     Debtor's only asset is the Property that, according to Debtor's own records, does not generate sufficient income to sustain a Chapter 11 Plan. The rent roll provided by Debtor reflects monthly rental income of $48,020.00 and annual rental income of $782,438.93. *See* **<u>Exhibit B-18</u>**. This does not account for expenses.

48.     As disclosed during the Section 341 creditor's meeting, Debtor has more than $500,000 in unpaid property taxes for the Property for 2018 and 2019. Interest on the Debtor's secured obligation to BBVA (even at a nondefault rate) currently accrues at the approximate amount of $60,193.66 per month (i.e., $2,006.45527 per day for thirty (30) days). *See* Ex. A ¶10.

49.     Accordingly, the Debtor's asset does not come close to generating enough income to sustain a plan of reorganization.

50.     Further, although the 90-day period does not expire until May 4, 2020, as of the date of this filing, Debtor has not made adequate protection payments under 11 U.S.C. § 362(d)(3). *See Little Creek*, 779 F.2d at 1073 (describing as bad faith the circumstance in which the debtor had "no available sources of income to sustain a plan of reorganization or to make adequate protection payments").

51.     The only way this Debtor could conceivably pay the matured Loan would be for Nate Paul, his entities, or principals of his entities, or some other third party to pump more money into the Debtor—a situation that at least one court has characterized as cause to lift the stay. *See Brentwood Group*, 2010 WL 2900327, at *12 (finding cause to lift the stay when the debtor could not service its debt without an equity infusion from the debtor's control person, his family, or entities that he controlled). Practically speaking, if such an equity infusion were a realistic probability, it would have already occurred back in 2019 when: (a) the Loan matured; (b) the payments required under the Forbearance Agreement came due; or (c) to avoid the First, Second, or Third Foreclosures.  Since entering the Forbearance Agreement, nine additional entities that are owned, controlled, or affiliated with Nate Paul have also filed bankruptcies.  None of those cases have proposed feasible plans for reorganization.  All of these circumstances, combined with the unfortunate circumstances surrounding Mr. Paul's criminal investigation, make reorganization a pipe dream.

52.     The Debtor's only plausible motive for continuing to delay BBVA's exercise of its rights is to retain equity for its principals.  However, when compared to all the other factors suggesting that the Debtor filed this bankruptcy case in bad faith, the "totality of the circumstances" compel the conclusion that BBVA is entitled to stay-relief for "cause" under Section 362(d)(1).  *See City of Angel*, 2012 WL 6694075, at *3.

iv.     Third <u>*Little Creek*</u> Factor: two-party dispute.

53.     This is essentially a two-party dispute.  Aside from the indebtedness owed to BBVA (which exceeds $4,000,000), the Debtor has averred that it has only one other secured creditor (the Travis County taxing authority) and a handful of unsecured creditors who are owed less than $14,000 total.  *See* ECF No. 21.  Debtor's representative, Mr. Elliott, explained at the Section 341

creditor's meeting that these unsecured creditors include: (a) one-time service providers; and (b) tenants that *may* be owed security deposits.  In light of such facts, this bankruptcy boils down to a two-party dispute between Debtor and BBVA over BBVA's repeated and lawful efforts to foreclose against the Property and otherwise exercise its rights and remedies under the Loan Documents.

> *v.*     Fourth <u>*Little Creek*</u> *Factor: bankruptcy filed as last-ditch effort to prevent foreclosure.*

54.     Fourth, Debtor filed this bankruptcy case to halt the pending February 4, 2020 foreclosure, the Third Foreclosure sale posted by BBVA in a period of three months.  Having been fraudulent induced to pull the First Foreclosure and enter the Forbearance Agreement, only for that then to be immediately breached, BBVA was no longer interested in another workout with Debtor.  Debtor had no other way to prevent the loss of the Property to BBVA except for filing this bankruptcy case.  *See Little Creek*, 779 F.2d at 1073 ("Bankruptcy offers the only possibility of forestalling loss of the property.").  Although the Debtor's decision to file this case to stop the foreclosure does not, standing alone, qualify as bad faith or merit immediate stay relief, this factor certainly favors granting relief from stay when considered alongside all the other indicia of bad faith present.

> *vi.*     Fifth <u>*Little Creek*</u> *Factor: allegations of wrongdoing.*

55.     Fifth, and finally, "allegations of wrongdoing" against Mr. Paul—the ultimate party responsible for Debtor—continue to swirl.  *Little Creek*, 779 F.2d at 1073.  BBVA does not need to belabor well-known facts that are already public knowledge including, for example, that the FBI raided Mr. Paul's home on August 14, 2019.  Suffice it to say, and as mentioned above, these events and allegations will make it difficult if not impossible for reorganization, suggesting that this bankruptcy case should not have been filed.

>    vii.    Based on the totality of the circumstances and the _Little Creek_ factors, the stay should be lifted.

56.    This is not just a case where Debtor has inadequate sources of income to sustain a plan, as noted by the Fifth Circuit in _Little Creek_.  It is a case where Debtor _has already_ failed to pay an enormous amount of debt owed by it – debt in excess of $4 million to BBVA and over $500,000 to the taxing authorities.  It is also a case where more and more expenses will be incurred to maintain the Property and where the Debtor, with insufficient income being generated by the Property to cover its debts and expenses, will presumably look to others to pay its bills as it seeks to buy time.  That same story has been told to BBVA (and apparently lenders in the other pending related cases as well) for some time now.  Time after time when asked to document its efforts, in this case and in others, to market the property or obtain financing, Debtor has refused or been unable to substantiate its claims.

57.    This undeniable pattern is fundamentally unfair and establish "cause" to lift the automatic stay and grant this Motion. _See_ 11 U.S.C. § 362(d)(1).[3]

## VI.    PRAYER

58.    For the forgoing reasons, BBVA requests that the Court grant this motion and enter an order lifting the automatic stay and permitting BBVA to foreclose on the Property in accordance with applicable state law. BBVA further requests all other relief to which it may be entitled.

DATED: April 30, 2020.

---

[3]    Further, courts have acknowledged that the existence of a pre-petition waiver of the automatic stay, like the one present in the Forbearance Agreement, can be considered when evaluating "cause" under Section 362(d)(1). _In re Powers_, 170 B.R. 480, (Bankr. D. Mass. 1994) (stating that "waiver is a primary element to be considered in determining if cause exists for relief from the automatic stay under § 362(d)(1)").  Accordingly, BBVA incorporates Section (V)(A) as additional grounds to lift the stay for cause.

Respectfully Submitted,

**DAVIS & SANTOS, P.C.**

By:    <u>/s/ Caroline Newman Small</u>

Sarah Santos
**Attorney-in-Charge for Creditor**
State Bar No. 24040955
E-mail: <u>ssantos@dslawpc.com</u>
Caroline Newman Small
State Bar No. 24056037
E-mail: <u>csmall@dslawpc.com</u>
719 S. Flores Street
San Antonio, Texas 78204
Telephone: (210) 853-5882
Facsimile: (210) 200-8395
***Attorneys for Creditor and Party-in-Interest BBVA USA***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certified that on April 30, 2020, a true and correct copy of the foregoing document was served on counsel of record and the parties below as follows:

WC 2101 W Ben White, LP      _____ Hand Delivery
814 Lavaca St.      X Regular Mail
Austin, Texas 78701      _____ Certified Mail/RRR
***Debtor***      _____ Facsimile
     _____ E-mail

U.S. Department of Justice      _____ Hand Delivery
OFFICE OF THE UNITED STATES TRUSTEE      _____ Regular Mail
615 E Houston Street, Suite 533      _____ Certified Mail/RRR
San Antonio, Texas 78205      X CM/ECF
E-mail: *USTPRegion07.S.ECF@UST.DOJ.GOV*      _____ E-mail
***United States Trustee***

Mark Ralston      _____ Hand Delivery
FISHMAN JACKSON RONQUILLO PLLC      _____ Regular Mail
Three Galleria Tower      _____ Certified Mail/RRR
13155 Noel Road, Suite 700      X CM/ECF
Dallas, TX 75240      _____ E-mail
T: (972) 419-5544
F: (972) 419-5501
Email: *mralston@fjrpllc.com*
***Debtor's Attorney***

Jason A. Starks      _____ Hand Delivery
Assistant County Attorney      _____ Regular Mail
TRAVIS COUNTY ATTORNEY      _____ Certified Mail/RRR
P.O. Box 1748      X CM/ECF
Austin, TX 78767      _____ E-mail
T: (512)854-9092
F: (512)854-9316
E-mail: *Jason.Starks@traviscountytx.gov*
***Attorney for Travis County***

Christopher H. Trickey      _____    Hand Delivery
Brian T. Cumings      _____    Regular Mail
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.    _____    Certified Mail/RRR
401 Congress Avenue, Suite 2700     X    CM/ECF
Austin, Texas 78701-5620      _____    E-mail
T: (512) 480-5620
E-mail: *ctrickey@gdhm.com*
**Attorneys for Denly ACI Partners, Ltd.**

                      *_/s/ Caroline Newman Small_*
                      Caroline Newman Small